Thank you, Your Honor. Good morning. May it please the court. My name is Rebecca Smith, and I represent the Appellants' Alliance for the Wild Rockies and Native Ecosystems Council. Your Honor, I'd like to address two primary issues today. The first issue is going to be the site-specific forest plan amendment, and the second will be the grizzly bear linkage corridor issue. For each of these issues, there's essentially two sub-issues that I'd like to discuss. First, addressing the forest plan amendment, what we have here is a failure to do NEPA analysis and a failure to do a cumulative effects analysis. Both of these are controlled by the plain language of regulations. I guess I would like to just start by looking at these regulations that control in this case. In our briefing, we suggested that the 2000 NIFMA regulations controlled... Let me ask a question, and maybe I'm on the wrong argument, but I think I'm not. Are you really challenging then whether the EIS was prepared in accordance with NEPA? Your Honor, our NEPA challenges are to the site-specific forest plan amendment. The first NEPA challenge to the site-specific forest plan amendment is that there was no NEPA analysis that allowed public comment for the forest plan amendment prior to the decision authorized that amendment. And then the second NEPA challenge specific to the amendment is that there was no cumulative effects analysis that analyzed all of the other site-specific forest plan amendments across the forest. Did you present the cumulative effect analysis to the district court? Yes, Your Honor. We did. And I would like to just look at the regulation... It seems to me that the only place you did that may have been in a reply brief and did not in the district court, so I'm having a tough time. Your Honor, I believe that was fully briefed, and I can provide those citations to the briefing on rebuttal. Addressing the first issue, as I said earlier, while we presented that the 2000 NIFMA regulations controlled, the government suggested that the 1982 regulations controlled. Regardless, both of those sets of regulations require that a site-specific forest plan amendment complies with, quote, NEPA procedures, end quote. So the site to the 82 regulations is 36 CFR 219.10.F.2000. And so what that means, what a NEPA procedure is, is defined further in the regulations. The 1982 regulations say that NEPA procedures include the rules, policies, and procedures governing agency compliance with NEPA as set forth in the CFR. That's at 36 CFR 251.51. Then in turn, at 40 CFR 1500.1B, it says, quote, NEPA procedures must ensure that environmental information is available to public citizens before decisions are made. And so in response to our argument that there was no environmental analysis for the amendment before it was authorized, in the government's response brief, what they said was, at page 11, they said that the Forest Service, quote, authorized an amendment to the forest plan, exempting the project area from these two standards, and discussing the environmental effects of that decision in the ROD. And then they cite ER 299 to 305. So they're admitting that there was no environmental analysis of this amendment until the record of decision. And that's fundamentally inconsistent with NEPA to do the analysis after you've made the decision. The whole purpose of NEPA is that you do it before the decision so that the public can help formulate alternatives before a decision. And so the government's only real response then at page 30, the government's only response is essentially that, this is at 23 through 25, they basically say that the fact that they notified the public that there might be a forest plan amendment sufficiently gave the public public notification. And then they cite in part to the regulation, but the regulation requires public notification and NEPA procedures. And so the NEPA is the part that's missing, and their brief is really devoid of any explanation as to how that would have occurred because it, in fact, did not. Moving on to the inadequate cumulative effects analysis, again, in the agency's brief, what they say at page 33, they say that the forest plan amendment itself, quote, discusses the cumulative impacts of this amendment with other prior forest plan amendments. Before we go there, as I understand what the government argues is that it published the notice that it was going to conduct the EIS in the December 2005. Then it published a draft EIS in 2006 and again in 2009. And then after publishing these drafts, the Forest Service engaged in public discussion. In fact, they talk about the scoping document was sent to 533 individuals. Two open houses were held. Ninety comments were received. Two open comment periods. And, Your Honor, what you're citing, too, is the EIS for the project itself. What our argument is today is that there was no NEPA analysis for the forest plan amendment itself. And so those are two different actions. The forest plan amendment itself had no analysis and public comment on the analysis. As the agency admits, again, in their brief at page 11, the environmental effects of the decision of the amendment were not discussed until the actual decision. They cite ER 299 to 305, which is the record of decision. So those are two separate issues. And we're not disputing that they did a NEPA analysis for the project. The argument here is that they completely failed to do a NEPA analysis for the forest plan amendment prior to authorizing that amendment. And if I could go back to the cumulative effects argument again, as I said, at page 33, all that they're arguing is that they addressed prior site-specific amendments. And so, again, this is a matter of clear regulatory language at 40 CFR 1508.7. It says a cumulative effects analysis includes past but also present and reasonably foreseeable. So there's no dispute that they did not acknowledge, discuss, analyze cumulative effects of other present or reasonably foreseeable site-specific forest plan amendments. Did you raise that point as you just raised it in your opening brief or that that was what you provided in your reply brief? Your Honor, what we presented factually in our opening brief is that we had evidence from another case that there is evidence that the Forest Service was systematically failing to comply with these forest land standards and that a number of elk, the majority of elk units across the forest failed these standards. And so that was where our client's concern came for. They said, well, what's going on on the rest of the forest? And then in the government's response to our opening brief, they said, well, you haven't proven that there's any reasonably foreseeable projects out there that we didn't consider. And then the government even went so far as to say, and there are none. So that was why in our reply brief, we went on the Forest Service's own website and said, well, look here, it says the next five timber sales are all going to implement this exact same site-specific forest land amendment. And, I mean, I would like to emphasize here that the law actually does not require that the plaintiffs, that the conservation groups, analyze the cumulative effects and know what all the reasonably foreseeable impacts are. So, for example, in Davis v. Coleman, in Friends of the Clearwater, and most recently in Tomoak Tribe, this court has repeatedly said it's the agency's job to analyze the cumulative effects, not the plaintiff's job to guess what those cumulative effects might be. And, in fact, in Tomoak Tribe, this court addressed for the first time whose burden it was and specifically said it's the agency's burden to do this. They can't put that onus on the public to do that. And I could give you a site for that case. Well, I don't think the site is quite as important. I want the government to respond, but the problem comes in. I'm like Judge Fisher. I'm not sure the argument was really raised in the opening brief. I think there was an argument made in the reply brief, and then I tried to find it in the district court, and I couldn't find it. That's why I ask you that specific question. Your Honor, I will find those citations for you on my rebuttal. And I would like to look back at the case that we've cited throughout briefing, absolutely Native Ecosystems Council v. Dombeck, which is 304 Fed Third at 897. This is an almost identical case, which we've always argued controls our case. And I would like to just quote from that opinion at 897. It says, quote, The Forest Service argues that it need not consider other road density amendments within the Derrick Eagle EA because the amendments are spread throughout the Gallatin National Forest. We disagree. The National Forest was the geographic unit within which the Forest Service chose to set forth binding road density standards. In the Forest Plan, all of these sales are proposed within the Gallatin National Forest and will necessarily have additive effects within that management unit. Unless the cumulative effects of these amendments are subject to analysis, even though distantly spaced throughout the forest, the Forest Service will be free to amend road density standards throughout the forest piecemeal without ever having to evaluate the amendments' cumulative environmental impacts. NEPA does not permit this. This is almost identical to this case, and this absolutely that we cited this case throughout district court and appellate briefing because it is almost the same fact situation. Case name again? That was Native Ecosystems v. Dombeck. That's fine. I got it. Let me go at this a slightly different way. As I read the documents prepared by the Forest Service, they don't contest that the elk cover standard is not satisfied now and that as a result of this project the elk cover standard will be in fact even less complied with, but they conclude that the long-term effect of this project will be very likely to improve the elk cover. How do you respond to that? I guess I should add one more thing. If it's true that this project will have the consequence in the end of improving it, why do we need to do a cumulative effect when in fact we might be able to conclude that this makes the standard better rather than worse, and therefore whether those others might make it worse, well, that doesn't matter because this one makes it better. So how do you respond to that? First of all, Your Honor, the requirement under NEPA for a cumulative effects analysis does not hinge on whether the impact is adverse or beneficial. So fundamentally under NIFMA you're supposed to have a systematic land management plan that applies consistently. So a piecemeal approach where each specific timber sale that violates the forest plan is simply exempted from those standards. At some point the agency does have to do a cumulative effect analysis. And our other response is that logging and removing hiding covers is not improving elk habitat. Even if the trees fall, it still provides cover from hunters hunting elk. So you dispute the conclusion that this may improve elk cover in the long run? Absolutely, Your Honor. On what basis did you dispute that? Well, if the trees fall down, then they're still there, and the elk hiding cover requires that you can't see an elk from 200 feet. So if there's a bunch of trees that had fallen down, you're not going to be able to see an elk. I understand that, and the report clearly says that. That's going to be the short-term effect. Do you contest that the long-term effect will not be to improve? Well, yes, Your Honor, because additionally when trees fall down, they provide micro-habitat sites that allow other trees to grow. And logging compacts the soil and makes it much harder for trees, especially in the northern Rockies, to grow back. So logging will have a series of cumulative effects over time that degrade this area and inhibit the ability of the forest to even grow back. But if I could, I would like to just... That strikes me as just contradictory to their Forest Service judgment. I mean, they have the opposite conclusion on that point. They do, Your Honor, but regardless of whether it's a negative or beneficial effect, they still do have to address cumulative effects. And, Your Honor, I see that I am almost out of time. Could I reserve my remaining time for rebuttal? Thank you. Good morning, Your Honors, and may it please the Court. My name is Lane McFadden. I'm here on behalf of the U.S. Forest Service and the U.S. Fish and Wildlife Service. I'll talk about the forest plan amendments here in a second, but I'd like to briefly catch the Court up to date. After this project was delayed by litigation, we did have a very severe wildfire on the project area last summer. Some 1,600 acres were burned at high severity, which means 90% of the burned area. We lost the understory and the canopy trees. It was all gone. The project is now at the status where all the trees have been cut. Nearly all have been removed by the units. If there's any left out there, they'll be gone by the end of next week. But we haven't...we're not making suggestions of mootness at this point. There is still some work to be done. Some of the fuels reduction work is left to be done. Only about half the temporary roads have been obliterated. The other half are gone. And the road decommissioning of the 9 1⁄2 additional roads that are being removed as part of the project, that happens next summer. And then prescribed burning that's part of the project will start sometime in 2017. Let me answer... I'm not sure what the consequence of that is. Obviously, some of the project is not going to be able to go forward in the way contemplated. How much of the land that was subject to the original project as originally conceived still survives in its otherwise current state after the fire? Well, 10% of the project area, the 15,000 acre project area was burned. That included one treatment unit. So there was one unit where there was... 10% was burned. Right. And the Forest Service has revisited the project. So that's kind of the scope of this litigation. But just so you know, it's sort of revisited to assess the current status and its proceeding. So it's a proceeding of pace. I just wanted to give the court that information as it's been a while since the lawsuit was filed. As to the forest plan amendment itself, the explanation in our brief that the forest plan amendment document, the record of decision appended to the overall project rod, explains the environmental analysis that underlies the forest supervisor's decision. It's not a concession that that was new analysis. All of the underlying environmental analysis and the rationale for the amendment was included in the draft EIS and in the final EIS, all of which was subject to public notice and comment. Discussion of elk viability, how the population is doing both at the forest level scope and at the scope of the elk herd unit, which is the scope at which biologists determine effects on the elk, is all included in the environmental impact statement. The effect of reducing hiding cover in both these elk herd units, both long term and short term, is covered in the environmental impact statement. The effect of the open road density on elk during the hunting season and the implications that might have for the project, which led to some restrictions on logging during hunting season and some other mitigation measures, is all included in the environmental impact statement. It is not true that the environmental analysis for the forest plan amendments were not provided as part of the overall NEPA consideration of the overall project. The NIFMA regulations that apply to forest plan amendments specifically contemplate that sometimes you're going to have a non-significant forest plan amendment as part of a larger project. Those are precisely the regulatory procedures that were followed here. The satisfactory conclusion of NEPA procedures was done by the publication of an environmental impact statement, which we are now told there are no NEPA challenges to the sufficiency of that environmental impact statement. It contains every bit of the necessary environmental analysis to understand what the effect of continued non-compliance with the forest plan standards will be on the elk and what the effect of removing some additional hiding cover will be on them short-term and long-term. It's all there. There's a suggestion in the... Are you saying, in effect, the cumulative effects or impact analysis is all implicit in that wealth of information? It's actually explicit, Your Honor. Appendix C of the EIS is the cumulative effects discussion, and it contains in a portion not excerpted for you, unfortunately, a discussion of the three projects mentioned in the reply brief as the ones they concede might have been reasonably foreseeable, Warm Springs, Stonewall, and Telegraph, are all listed in the EIS's table of reasonably foreseeable activities with potential cumulative effects, but it was concluded both there and in a wildlife report that was prepared by the specialist that's in the administrative record that those projects had no cumulative effect on the elk habitat at question in this project area because they are completely outside of the Big Belt Mountain Range. They are in a completely different, unrelated portion of the forest. You can look at SER 300. The EIS describes why it is that when you're concerned about elk, you have to choose the appropriate boundary of analysis and the appropriate boundary here. With the two elk herd units, the elk stay very closely within their winter range. They don't wander the entire length of the forest. The Forest Service did consider effects on the elk at a scale quadruple the size of the project area, about 63,000 acres. Your answer to counsel is we did consider it. We considered it in the whole of the area rather than for this particular plan. Right. The forest plan amendments, continuing to not comply, is part of the proposal being considered in the EIS, and its effects were explicitly addressed. Its cumulative effects with other projects, as well as its direct effects by reducing hiding cover. It's all talked about. It's all there. There is one component in the record of decision that is not in the EIS, which is the discussion of the four past forest plan amendments of these standards in other parts of the forest. That's disclosed for the sake of full disclosure, and those projects are described. Again, notice that there are no cumulative effects when combined with this present amendment found in that record of decision. There's also, in terms of the NIFMA compliance of this forest plan amendment, there's been no challenge to the actual legal decision, which is the determination that it was a non-significant amendment, which is made by specific standards in the 1982 regulations, and in the Forest Service Handbook. It's all documented in the record of decision, and all of it goes unchallenged in this case. The agency walked through the appropriate NIFMA regulations and complied with all of them. The only objection is to public notice, which is frankly not really tenable on this administrative record. In addition to complying with the need for legal notice, the Forest Service held public workshops and indeed took representatives of these plaintiff agencies personally on a field trip with Forest Service officials to these treatment units to see them. On that trip, they talked about the potential for forest plan amendments, and they invited the plaintiff organizations to comment on that and solicit more information. Public notification was more than satisfied by the Forest Service in this case. The suggestion that Dombak is an identical case is one I would like to push back on a little bit. We did distinguish it factually in our brief. That's a case where in the Gallatin, as part of the Healthy Forests Restoration Initiative, you had a package of timber sales all put forward together, all spread across the forest. There were a dozen of them at a time going forward contemporaneously, and this court said, well, you have to look at those because those are clearly reasonably foreseeable. There really can be no question about that. But the other aspect of that case that distinguishes it importantly from this one is what forest standard was at issue in that case. In that case, the Gallatin has a forest plan standard that is a forest-wide numeric criteria. It is a 70% elk habitat effectiveness rule, and the plaintiffs said that if you're reducing the elk habitat effectiveness in any part of the forest, that is necessarily going to have an effect on the forest's overall compliance with that numeric standard. In this case, there is no such thing as a forest-wide numeric standard for elk habitat. The big game standards at issue, the 3 and 4a, are specific to elk herd unit or specific drainages, and that is biologically driven choice because that is where the elk can find themselves. Those are big areas, but the Helena is a 350-some thousand acre forest, and there is simply no indication in the forest plan that there is any requirement to consider all of these issues forest-wide. The determination is what will the effect be on the elk, and that's made at the mid-scale boundary level, that 63,000 acre scale that's included in the record. There is no challenge in this case to the adequacy of the Forest Service's expert findings that in the short term, the elk will benefit because the underburning in the project, the prescribed burning, is going to create new forage habitat, which the EIS explicitly finds is going to create new forage the next spring, which is going to benefit the elk, and that benefit will outweigh the adverse effect of a 6% or 1% reduction in hiding cover. I misunderstood you. You just said there will be short-term benefit to the elk? Short-term in the terms of the forest, so in a few years. The prescribed burn described in the EIS specifically finds that you'd get increased foraging habit as soon as the next spring. You said foraging habit? Foraging, yes, Your Honor. So you're saying there's benefit to the elk in the sense of forage, but not short-term benefit in the sense of cover? No, in the short term, you're going to have adverse effects from reducing cover. I was very clear about that, but the EIS... Is there any evidence that the elk are currently short of forage? That is to say, so if I've already got plenty to eat and you give me a little more, that's not really a great benefit. Thank you very much. Yeah, if you look at the excerpt of Record 334, that's one place where this is discussed. So the forest plan is specific about hiding cover, and hiding cover is the key measure. But later science, the Christensen article advocated by the planets and discussed in the EIS talks about elk habitat more broadly, and that includes forage as an important consideration and other things that are also important. And so the EIS looks at the effects that way because that is the more current science and says expressly that the increase in foraging habitat as a benefit of the project is a benefit that will outweigh the adverse consequences of the reduction in hiding cover. And then in the long term, as Your Honor already noted, the Forest Service found that the regeneration of this forest at a healthy space with the more historic species will be more resilient, will provide better hiding cover, and will in the long term improve things. The word that the Forest Service used was may. It's always a may. These are predictions. It didn't say will, it said may. That's right. It said may as to the long term effect. It says would as to the short term effect. It's quite confident in that prediction. But the dispute raised here about microhabitats and whether the falling trees would be better for the elk is all new today. It's not an issue that's presented. It's a NEPA argument that would in any way be foreclosed by the absence of contrary expert evidence or any indication that Forest Service overlooked any important project. I think that addresses the Forest Plan amendments. Unless Your Honors have a question about the grizzly bear, I would ask simply that the District Court be affirmed. Okay. Thank you. Response? You've saved a minute thirty. Let's put two on the clock and see what happens. Your Honor, I just looked when the government said it's not in the record but Appendix C of the EIS, he said he represented that it discussed these three projects. That's a table and it does not mention at all that there is going to be a site specific Forest Plan amendment for those three projects and that's the issue that we're talking about here today. So, that citation he gave does not include even an acknowledgement that there would be a site specific Forest Plan amendment for those projects. Regarding his representation that now he's sort of retracting the statement that the environmental analysis was in the record of decision, he then said it's all over the place but failed to give a single citation that we could actually verify to see if there was an analysis of environmental effects somewhere else because there isn't. He then admitted that only the past Forest Plan amendments had been disclosed in the record of decision. So again, that leaves out the two-thirds of the cumulative effects analysis present and reasonably foreseeable. In regards to his argument that there was adequate public notification, I would just emphasize again that that's only half of the legal requirement. It requires public notification and NEPA. Again, this environmental analysis didn't happen until after the decision. Regarding his reference to Dombeck, he said that there was numeric criteria there that were forest-wide and that there were reasonably foreseeable other amendments. We have both of those situations present here. That case really is not meaningfully distinguishable at all. And then finally, regarding Judge Smith's question about whether we raise this issue, I did look back in the District Court document 15 and document 21. Document 15 at page 21 through 23. Document 21 at 22 to 24. Raise the cumulative effects issue in the District Court and specifically cite and discuss Dombeck. And then in our opening brief, we specifically raised cumulative effects at page 32, raising the full regulation including the language about reasonably foreseeable actions at 32 through 33. We specifically quoted and addressed Dombeck. And I see that my time is up unless you have any further questions. Thank you very much. Thank both sides for their arguments. Alliance for the Wild Rockies and Native Ecosystems Council versus Kruger, submitted for decision. And that completes our arguments for the week.
judges: W. Fletcher, Fisher, N.R. Smith